United States Court of Appeals,

Eleventh Circuit.

No. 95-8397.

UNITED STATES of America, Plaintiff-Appellee,

v.

Donald W. WRIGHT, Defendant-Appellant.

July 24, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-CR-274-1-ODE), Orinda D. Evans, Judge.

Before COX, Circuit Judge, and KRAVITCH and CLARK, Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In this case, we must decide whether this amendment grants constitutional protection to an individual whose possession or use of machineguns and pipe bombs is not reasonably related to an organized state militia. We hold that it does not. We also hold that Congress had ample authority under the Commerce Clause to prohibit the possession or transfer of machineguns pursuant to 18 U.S.C. § 922(*o*). Accordingly, we AFFIRM appellant's convictions. Because we conclude that the district court erred in applying the Sentencing Guidelines, we VACATE appellant's sentence and REMAND for resentencing.

## I. Background

In June 1994, the Bureau of Alcohol Tobacco and Firearms received information that Donald Wright was looking for someone to reassemble a .50 caliber machinegun. Subsequently, two undercover local law enforcement agents were introduced to Wright as individuals capable of reassembling this gun. At this meeting, Wright produced the disassembled machinegun and told the agents that, once it was reassembled, he planned to shoot the gun, grease it, and then bury it. Agents arrested Wright in possession of the disassembled machinegun as he drove away from the meeting. Upon arrest, Wright consented to a search of his residence during which agents discovered a .223

caliber Olympic Arms model Car-AR automatic assault machinegun and three pipe bombs in a shed outside his home. Agents also found several other unregistered assault weapons, ammunition, and assorted documents and videotapes describing threats to United States sovereignty posed by the "New World Order."

Wright was charged with one count of possessing machineguns in violation of 18 U.S.C. § 922(*o*) and with one count of possessing unregistered destructive devices in violation of 26 U.S.C. § 5861(d). He filed a motion to dismiss the indictment on the grounds that the charging statutes violated, among other constitutional provisions, the Commerce Clause and the Second Amendment.[1] In support of his motion, Wright submitted the seized documents and videotapes to demonstrate that his weapons possession was motivated by what he perceived to be the danger of the "New World Order." He also offered the testimony of a firearms expert to establish that the machineguns and pipe bombs were the type of weapons used by contemporary militias. The district court, adopting the magistrate judge's report and recommendation, denied his motion.

Wright then pleaded guilty to both counts of the indictment pursuant to a negotiated plea agreement in which he reserved the right to appeal the denial of his motion to dismiss the indictment on constitutional grounds. As part of the plea bargain, the government agreed to recommend that Wright be credited with a downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. At his sentencing hearing, Wright admitted that he possessed the machineguns and pipe bombs referred to in the indictment, and explained that he had planned to bury the weapons for use in case of an invasion. Wright further testified that he belonged to a twenty-member "military" group that met once a week to exchange information and to conduct training drills, but declined to identify other members of the group or the location of the group's training exercises.[2] He again claimed that his membership in this group and his weapons possession were motivated by

---

[1]In the alternative, Wright requested a jury instruction on his Second Amendment defense. Because we conclude that Wright can claim no Second Amendment protection, we find no error in the denial of his request for a jury instruction on this issue.

[2]Wright admitted that this military group was not in any way affiliated with the government of the State of Georgia.

perceived threats to United States sovereignty. Based on this testimony, the district court rejected Wright's request for, and the government's recommendation of, an offense-level reduction for acceptance of responsibility, and sentenced him to forty-one months' imprisonment.

On appeal, Wright asserts several challenges to his convictions and sentence. He claims that 18 U.S.C. § 922(*o*) exceeds Congress's power under the Commerce Clause and contends that § 922(*o*) and 26 U.S.C. § 5861(d) violate his Second and Ninth Amendment rights. Finally, Wright argues that the district court improperly penalized him for making these constitutional challenges by denying him a downward adjustment for acceptance of responsibility.

## II. Discussion

*A. Commerce Clause*

Section 922(*o*) states:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*) (1994).[3] Section 922(*o*) thus criminalizes, with limited exceptions, the mere possession of machineguns that were acquired after May 19, 1986 regardless of whether these guns traveled in or otherwise affected interstate commerce.

Relying on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995),

---

[3]"Machinegun" is defined under the statute as:

any weapon which shoots, is designed to shoot, or can be readily stored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b).

Wright contends that section 922(*o*)'s blanket ban of the possession of machineguns violates the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3.[4] In *Lopez,* the Supreme Court ruled that 18 U.S.C. § 922(q), which made it illegal for "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone," violated the Commerce Clause. The Court concluded that § 922(q) could not "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." 514 U.S. at 561, 115 S.Ct. at 1631.

Wright bases his challenge to § 922(*o*) on its similarities to the section struck down in *Lopez.* Wright notes that: (1) neither section has a jurisdictional element requiring a connection between the gun and interstate commerce; (2) the enactment of both sections was unsupported by legislative findings connecting them to interstate commerce; and (3) both sections criminalize the mere possession of guns. Wright further claims that, like section 922(q), section 922(*o*) is "a criminal statute that by its terms has nothing to do with "commerce' or any sort of economic enterprise, however broadly one might define those terms." *See Lopez,* 514 U.S. at 559-62, 115 S.Ct. at 1630-31. On these grounds, Wright argues that this case is indistinguishable from *Lopez* and that, because there is no evidence that the machineguns he possessed traveled in interstate commerce, the count of the indictment charging him with a violation of § 922(*o*) should be dismissed. We review his Commerce Clause challenge *de novo. United States v. Olin Corp.,* 107 F.3d 1506, 1508 (11th Cir.1997).

Wright's reliance on the first two similarities between sections 922(*o*) and 922(q) is misplaced. We recently rejected the argument that *Lopez* requires Congress to place a jurisdictional element in every statute enacted pursuant to the Commerce Clause or to make formal legislative

---

[4]Wright also claims that § 922(*o*) violates the Tenth Amendment. Because we conclude that Congress had sufficient authority under the Commerce Clause to enact § 922(*o*), we need not address his Tenth Amendment challenge. When Congress acts within its power under the Commerce Clause, then the "Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States,* 505 U.S. 144, 153, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992).

findings connecting the regulated activity to interstate commerce. *Olin,* 107 F.3d at 1510. In *Olin,* we concluded that "although Congress did not include in CERCLA either legislative findings or a jurisdictional element, the statute remains valid as applied in this case because it regulates a class of activities that substantially affects interstate commerce." *Id.*[5]

We are thus left to determine whether Congress's decision to prohibit in § 922(*o*) the mere possession of machineguns is constitutionally permissible.[6] Wright argues that the Court's decision in *Lopez* to strike down § 922(q)'s prohibition of the mere possession of firearms in school zones requires the same result in this case. We disagree. Because section 922(*o*) enacts a total ban on the possession and transfer of machineguns, while section 922(q) regulated only the possession of firearms in a limited, discrete geographic sphere, we conclude that this case is easily distinguishable from *Lopez.* We further conclude that Congress had sufficient authority under the Commerce Clause to enact § 922(*o*).

It is important to note that *Lopez* did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority. *Olin,* 107 F.3d

---

[5]Section 922(*o*) was enacted in 1986 as part of the Firearm Owners' Protection Act, Pub.L. No. 99-308, 100 Stat. 449. The only apparent explanation in the legislative record for the enactment of § 922(*o*) was the statement of its sponsor, Representative Hughes: "I do not know why anyone would object to the banning of machineguns." 132 Cong. Rec. H1750 (daily ed. April 10, 1986). Several courts have relied on congressional findings issued pursuant to the enactment of prior gun control legislation, namely the Omnibus Crime Control Act and Safe Streets Act, Pub.L. No. 90-351, 82 Stat. 197 (1968), in evaluating the constitutionality of § 922(*o*). *See, e.g., United States v. Rybar,* 103 F.3d 273, 279 (3d Cir.1996). Because we find adequate support for the enactment of § 922(*o*) without reference to any legislative findings, we need not determine the proper role of such prior findings in conducting Commerce Clause review. *See Olin,* 107 F.3d at 1510 n. 6 (suggesting, without deciding, that prior legislative findings can be used to sustain Commerce Clause challenge); *see also Lopez,* 514 U.S. at 563-65, 115 S.Ct. at 1632 (declining to review earlier findings because § 922(q) represented a "sharp break" with prior firearms legislation) (quoting *United States v. Lopez,* 2 F.3d 1342, 1366 (5th Cir.1993)).

[6]In *United States v. Bass,* 404 U.S. 336, 339 n. 4, 92 S.Ct. 515, 518 n. 4, 30 L.Ed.2d 488 (1971), the Supreme Court left open the question of whether the Commerce Clause granted Congress the power to punish the "mere possession" of firearms. In that case, the Court interpreted 18 U.S.C. § 1202(a) to apply only to the possession of firearms "in commerce or affecting commerce," and thus did not reach the constitutional issue. In contrast, the Court in *Lopez* concluded that because § 922(q) contained no ambiguity, it could not be read to contain a jurisdictional element. 514 U.S. at 561-63, 115 S.Ct. at 1631. We likewise find no ambiguity in section 922(*o*), and thus proceed to consider the constitutional question.

at 1509; *see also Lopez,* 514 U.S. at 567-69, 115 S.Ct. at 1634 (refusing to adopt "additional expansion" of congressional authority under the Commerce Clause). Rather than undermining its prior Commerce Clause precedents, the *Lopez* Court merely established some "outer limits" to Congress's Commerce Clause authority. *See Lopez,* 514 U.S. at 555-57, 115 S.Ct. at 1628. When ruling on a Commerce Clause challenge, we must determine, as always, "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Id.* at 557, 115 S.Ct. at 1629; *see also United States v. Kenney,* 91 F.3d 884, 886 (7th Cir.1996) ("Our task is merely to determine whether Congress could have had a rational basis to support the exercise of its commerce power; and, further, that the regulatory means chosen were "reasonably adapted to the ends permitted by the Constitution.' ") (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 275, 101 S.Ct. 2352, 2359, 69 L.Ed.2d 1 (1981)).

Whether or not Congress had a rational basis to conclude that the possession or transfer of machineguns has a sufficient connection with interstate commerce depends on whether this activity falls within any of the three categories of activities that Congress has authority to regulate under the Commerce Clause: (1) the use of channels of interstate commerce; (2) instrumentalities of and persons or things in interstate commerce; and (3) intrastate activities that substantially affect interstate commerce. *Lopez,* 514 U.S. at 557-61, 115 S.Ct. at 1629-30. Since *Lopez,* several circuits have concluded that § 922(*o*) regulates channels of or things in interstate commerce.[7]

Although § 922(*o*) most often will regulate channels of and things in interstate commerce, its reach extends beyond these two categories by criminalizing the possession of guns that have never been a part of interstate commerce. For example, a machinegun may be created by converting a non-automatic gun, and machineguns may also be manufactured and sold within a single state. *See Kenney,* 91 F.3d at 889. Because § 922(*o*) has no jurisdictional element, it has the potential to criminalize the possession of such guns that have never traveled in interstate commerce. We

---

[7]*See United States v. Beuckelaere,* 91 F.3d 781, 783-85 (6th Cir.1996) (upholding § 922(*o*) as a regulation of channels of and things in interstate commerce); *United States v. Rambo,* 74 F.3d 948, 952 (9th Cir.) (upholding § 922(*o*) as regulation of channels of interstate commerce), *cert. denied,* --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *United States v. Wilks,* 58 F.3d 1518, 1521 (10th Cir.1995) (upholding § 922(*o*) as regulation of things in interstate commerce).

therefore conclude, in accord with the Third and Seventh Circuits, that § 922(*o*) cannot be justified solely as a regulation of channels or things in interstate commerce, but must instead be analyzed under the third *Lopez* category as a regulation of activities that substantially affect interstate commerce. *See United States v. Rybar,* 103 F.3d 273, 283 (3d Cir.1996); *Kenney,* 91 F.3d at 889.

Section 922(*o*) thus can survive Commerce Clause scrutiny only if we find that Congress had a rational basis to conclude that the conduct regulated by § 922(*o*) "arise[s] out of or [is] connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1631. In other words, the statute "must bear more than a generic relationship several steps removed from interstate commerce, and it must be a relationship that is apparent, not creatively inferred." *Kenney,* 91 F.3d at 888.

Examining the class of activities regulated by § 922(*o*)—the possession or transfer of machineguns, we find ample constitutional support for the enactment of this statute. Unlike the statute at issue in *Lopez,* section 922(*o*) contains no geographical restriction; it simply bans the transfer or possession of all machineguns not lawfully possessed in 1986. With this ban, Congress eliminated completely the lawful demand for machineguns in this country and effectively froze the number of legal machineguns in private hands at its 1986 level. *See Kenney,* 91 F.3d at 885. In our view, the connection between the elimination of the lawful demand for machineguns and the manufacture, importation, and interstate transfer of these products is obvious and direct.[8] We therefore hold that Congress had a rational basis to determine that a total ban on machineguns would have a substantial effect on interstate commerce.[9] *See Rybar,* 103 F.3d at 283 ("[Section] 922(*o*) can

---

[8]The same cannot be said for the prohibition at issue in *Lopez.* By prohibiting only the possession of guns within 1,000 feet of a school, Congress could not rationally have expected to substantially affect the manufacture, importation, and interstate transfer of firearms.

[9]We note that every federal circuit to entertain a Commerce Clause challenge to § 922(*o*), either before or after *Lopez,* has upheld the constitutionality of this section. *See United States v. Knutson,* 113 F.3d 27 (5th Cir.1997); *Rybar,* 103 F.3d 273 (3d Cir.1996); *Kenney,* 91 F.3d 884 (7th Cir.1996); *Beuckelaere,* 91 F.3d 781 (6th Cir.1996); *Rambo,* 74 F.3d 948 (9th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *Wilks,* 58 F.3d 1518 (10th Cir.1995); *United States v. Hale,* 978 F.2d 1016 (8th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); *United States v. Evans,* 928 F.2d 858, 862 (9th Cir.1991); *see also United States v. Kirk,* 105 F.3d 997 (5th Cir.1997) (en banc) (affirming, by an equally divided court, district court order upholding § 922(*o*)). Although the Court in *Lopez* rejected the

be sustained because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns.").[10]

The fact that § 922(*o*) criminalizes some purely intrastate possession of machineguns is of no constitutional importance. "Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power "to excise, as trivial, individual instances' of the class." *Perez v. United States,* 402 U.S. 146, 152, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (citation omitted). The regulation of purely intrastate possession of machineguns "constitutes an appropriate element of [§ 922(*o*)'s] broader scheme" to reduce substantially the trade in machineguns. *See Olin,* 107 F.3d at 1511. We therefore reject Wright's Commerce Clause challenge.

*B. Second Amendment*

Wright also contends that § 922(*o*) and 26 U.S.C. § 5861(d)[11] violate his right to bear arms under the Second Amendment. As a member of Georgia's unorganized militia,[12] Wright claims that

---

rationale previously used in *Evans* to sustain § 922(*o*), *see* 514 U.S. at 563-65, 115 S.Ct. at 1632, we place no weight on that discussion because we base our ruling on a wholly different rationale than used by the Ninth Circuit in that case. (In *Evans,* the Ninth Circuit concluded that the rise in insurance costs caused by deaths attributable to firearms provided a sufficient nexus with interstate commerce to support § 922(*o*). 928 F.2d at 862.)

[10]Because we find that Congress was justified in its decision to regulate activities affecting the trade of machineguns, we need not decide whether § 922(*o*) can also be sustained by referring to the machinegun's special utility in the narcotics trade. *See United States v. Kirk,* 105 F.3d 997 (Opinion of Higginbotham, J.); *cf. Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971)(discussing the importance of extortionate credit transactions to organized crime).

[11]Section 5861(d) makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d)(1989). "Firearm" is defined to include any "destructive device." 26 U.S.C. § 5845(a)(1989).

[12]Georgia law provides for the division of the state militia into "the organized militia, the state reserve list, the state retired list, and the unorganized militia." Ga.Code Ann. § 38-2-3 (1995). The organized militia is comprised of the Georgia National Guard, the Georgia Naval Militia, and the State Defense Force, whereas the unorganized militia consists of all able-bodied male residents of the state between the ages of 17 and 45 who are not serving in any force of the organized militia and not listed on the state reserve or retired list. *Id.*

The United States Code similarly divides the militia into two classes: the organized militia, which consists of the National Guard and the Naval Militia, and the

he has a constitutional right to possess machineguns and pipe bombs because these weapons are used by contemporary militia fighting forces.[13]  We review his constitutional claim *de novo.  United States v. Unterburger,* 97 F.3d 1413, 1415 (11th Cir.1996).

Although this circuit has not yet determined the scope of "the right of the people to keep and bear Arms" under the Second Amendment,[14] the Supreme Court has provided us with important guidance in interpreting this constitutional provision.  In *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the Court considered whether the National Firearms Act of 1934, 26 U.S.C. § 1132, which required the registration of certain firearms, violated the Second Amendment rights of two individuals indicted for transporting unregistered sawed-off shotguns in interstate commerce.[15]  In reversing the district court's order, which dismissed the indictment as violative of the Second Amendment, the Court stated:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

307 U.S. at 177, 59 S.Ct. at 818.  Because the Court concluded that there was no evidence that the

---

unorganized militia, which consists of all males between the ages of 17 and 45 who are not serving in the organized militia.  10 U.S.C. § 311 (1983 & Supp.1997).

[13]Wright apparently has abandoned the claim, made before and rejected by the district court, that his membership in the non-governmental twenty-person "military" group entitles him to Second Amendment protection.

[14]Although we have never explicitly discussed the meaning of the Second Amendment, our prior cases have suggested a narrow reading of this provision.  For example, in *Farmer v. Higgins,* 907 F.2d 1041, 1045 (11th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991), an applicant for a permit to manufacture machineguns argued before this court that § 922(*o*)'s complete ban on machineguns violated his Second Amendment rights.  *See* Brief of Appellee, No. 90-8185, at 45-50.  Without discussion, we rejected this argument as "without merit."  907 F.2d at 1045;  *see also United States v. Williams,* 446 F.2d 486, 487 (5th Cir.1971) (rejecting, based on *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), Second Amendment challenge to 26 U.S.C. § 5861(d)'s registration requirement for sawed-off shotguns);  *United States v. Johnson,* 441 F.2d 1134, 1136 (5th Cir.1971) (same).

[15]*Miller* is the only case in which the Supreme Court has considered directly a Second Amendment challenge to a federal firearms statute.  In *Lewis v. United States,* however, the Court did reject an equal protection challenge to a federal firearm regulation because it determined that the statute did not "trench upon any constitutionally protected liberties."  445 U.S. 55, 58, 100 S.Ct. 915, 921 n. 4, 63 L.Ed.2d 198 (1980)(citing *Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206).

sawed-off shotgun was "any part of the ordinary military equipment or that its use could contribute to the common defense," the Court held that the statute did not violate the Second Amendment rights of the defendants. *Id.*

The fact that the *Miller* Court did not examine the possession or use of the sawed-off shotguns in that case in no way suggests, as appellant contends, that individual possession of a military-type weapon is protected by the Constitution irrespective of whether the possession or use of that weapon is reasonably related to a "well regulated militia." Without any evidence that the sawed-off shotgun at issue in that case could have been used as a weapon by a well regulated militia group to provide for the common defense, there was no need for the Court to determine if the actual possession or use of the weapons bore a reasonable relationship to a well regulated militia. As the Eighth Circuit concluded in *United States v. Hale,* "[i]t is not sufficient to prove that the weapon in question was susceptible to military use.... Rather, the claimant must prove that his or her possession of the weapon was reasonably related to a well regulated militia." 978 F.2d 1016, 1020 (8th Cir.1992); *see also Rybar,* 103 F.3d at 286; *United States v. Warin,* 530 F.2d 103, 106 (6th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976).

Therefore, in order to claim Second Amendment protection, Wright must demonstrate a reasonable relationship between his possession of the machineguns and pipe bombs and "the preservation or efficiency of a well regulated militia." Wright claims that he has satisfied this test because his weapons possession is reasonably related to his membership in Georgia's unorganized militia, which he asserts is "well regulated" within the meaning of the Second Amendment.

Because the sawed-off shotguns in *Miller* were not susceptible to use in any militia, the Court did not need to determine explicitly what constituted a "well regulated militia." A careful reading of *Miller,* however, strongly suggests that only militias actively maintained and trained by the states can satisfy the "well regulated militia" requirement of the Second Amendment. As the *Miller* Court emphasized, the "obvious purpose" of the Second Amendment was to "render possible the effectiveness of" the governmental militia described in the Militia Clauses of the Constitution.[16]

---

[16] U.S. Const. art. I, § 8, cls. 15 & 16.

*Miller,* 307 U.S. at 178, 59 S.Ct. at 818. Thus, the Second Amendment "must be interpreted and applied with that end in view." *Id.*

At the time of ratification, and as remains the case today, the militia was defined broadly and was understood to include "all males physically capable of acting in concert for the common defense." *Miller,* 307 U.S. at 177, 59 S.Ct. at 818. But because the Constitution protects only the possession or use of guns reasonably related to a "well regulated militia," membership in this broad segment of the population is constitutionally insignificant. In determining the scope of Second Amendment protection, the *Miller* Court did not rely on the commonly understood and wide-reaching definition of the militia, but rather turned to early militia laws of New York, Massachusetts, and Virginia, which provided for the training, maintenance, and equipping of these states' respective militias. *Id.* 307 U.S. at 177-78, 59 S.Ct. at 818-19. We find the *Miller* Court's reliance on these statutory provisions regulating "the organization and government of the Militia," *id.* at 181, 59 S.Ct. at 819, to be significant. In our view, it indicates that the *Miller* Court understood the Second Amendment to protect only the possession or use of weapons that is reasonably related to a militia actively maintained and trained by the states.

Moreover, after examining the text and history of the Second Amendment, we conclude that this reading of *Miller* is consistent with the motivating purposes of the drafters of the Second Amendment. The amendment describes a "well regulated militia" as "being necessary to the security of a free State." The fact that the drafters qualified "well regulated militia" by reference to state security suggests to us that they intended this term to refer only to governmental militias that are actively maintained and used for the common defense. We find substantial support for this textual reading in the history of the drafting and ratification of the Constitution and the Bill of Rights.

The Militia Clauses in Article I authorized Congress to organize, arm, and discipline the militia, but reserved to the states the authority to train the militia and appoint its officers. U.S. Const. art. I, § 8, cl. 16. This dual grant of authority reflected the tension between two competing concerns at the Constitutional Convention: the widespread distrust of a national standing army versus the danger of relying on inadequately trained soldiers as the primary means of providing for

the common defense. *See Perpich v. Department of Defense,* 496 U.S. 334, 338-39, 110 S.Ct. 2418, 2422-23, 110 L.Ed.2d 312 (1990). Despite significant debate as to whether the federal or state governments would control the militia, after the Constitutional Convention there remained uncertainty as to whether the authority to arm and to discipline the militia was exclusively federal. *See* Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?,* 15 U. Dayton L.Rev. 5, 23-24 (1989).

The Second Amendment was inserted into the Bill of Rights to protect the role of the states in maintaining and arming the militia. It was designed to protect the state militias from federal legislation enacted to undermine the role of state militias. *See Hale,* 978 F.2d at 1019 ("The Second Amendment prevented federal laws that would infringe upon the possession of arms by individuals and thus render the state militias impotent."). By guarding against congressional intrusion into the states' authority to maintain their respective militias and by protecting the ability of the militias to equip themselves, the amendment provided an important safeguard against congressional efforts to increase the need for or justification of a national standing army. *See* Ehrman & Henigan, *supra,* at 28 (noting fear that "by neglecting the militia, Congress would have an excuse to raise that great evil, a large standing army"); Laurence H. Tribe, *American Constitutional Law,* § 5-2, at 299 n. 6 (2d ed. 1988) ("[T]he central concern of the second amendment's framers was to prevent such federal interference with state militia as would permit the establishment of a standing national army and the consequent destruction of local autonomy.").

The concerns motivating the creation of the Second Amendment convince us that the amendment was intended to protect only the use or possession of weapons that is reasonably related to a militia actively maintained and trained by the states. With this conclusion, we join every other federal court that has been called on to consider the "well regulated militia" requirement of the Second Amendment,[17] several of which have considered and rejected the claim made by Wright in this case that membership in a state's unorganized militia is sufficient to bring gun possession within

---

[17]Not a single federal court since *Miller* has held that an individual has demonstrated a sufficient relationship between weapons possession or use and a "well regulated militia" so as to trigger Second Amendment protection.

the protection of the Second Amendment. *See Rybar,* 103 F.3d at 286; *Hale,* 978 F.2d at 1020; *United States v. Oakes,* 564 F.2d 384, 387 (10th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S. Ct. 1493, 55 L.Ed.2d 521 (1978); *Warin,* 530 F.2d at 106.

Faced with this overwhelming body of contrary authority, Wright nevertheless maintains that Georgia's unorganized militia is sufficiently well regulated to trigger constitutional protection. He notes that under Georgia law the Governor has the authority to prescribe and to establish regulations governing the unorganized militia. *See generally* Ga.Code Ann. §§ 38-2-70 through 38-2-73 (1995). Wright also refers to statutes that allow, under certain circumstances, "the Governor [to] call for and accept from the unorganized militia as many volunteers as are required for service in the organized militia." Ga.Code Ann. §§ 38-2-5, 38-2-72 (1995).

In our view, these statutes fall far short of rendering the Georgia unorganized militia "well regulated" for the purposes of the Second Amendment. The possibility that in responding to a future crisis state authorities might seek the aid of members of the unorganized militia does not speak to the militia's current state of regulation. Wright has not directed us to any Georgia statutes governing the actual, as opposed to potential, organization, training, and equipping of the members of the unorganized militia. *Cf.* Ga.Code Ann. 38-2-277(a) (1995) (prohibiting any "body of men other than the organized militia" or an authorized organization of the police or armed forces to "associate themselves together as a military unit or parade or demonstrate in public with firearms"). We therefore do not hesitate to conclude that the substantial segment of the population comprising the unorganized militia is not well regulated as that term was intended by the drafters of the Second Amendment.

Because Wright has presented no evidence to demonstrate any connection, let alone a "reasonable relationship," between his possession of the machineguns and pipe bombs and the preservation or efficiency of a militia actively trained and maintained by the State of Georgia, his weapons possession is entitled to no constitutional protection.[18] Therefore, we conclude in this case

---

[18]Having concluded that Wright has failed to make this requisite showing, we need not decide here whether the Second Amendment creates an "individual" or a "collective" right. *See Hale,* 978 F.2d at 1020 ("Whether the "right to bear arms" for militia purposes is "individual" or

that neither § 922(*o*)'s blanket ban of machinegun possession nor the registration requirements of § 5861(d) infringe on any constitutionally protected liberties.[19]

## C. Ninth Amendment

Wright also argues, without any supporting case law, that the criminalization of his possession of machineguns and pipe bombs violates his right to privacy and an unenumerated "natural" right to self-defense inherent in the Ninth Amendment. We are not persuaded by this contention, and refuse to establish a new constitutional right to possess weapons under this amendment. *Accord United States v. Broussard,* 80 F.3d 1025, 1041 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996); *Quilici v. Village of Morton Grove,* 695 F.2d 261, 271 (7th Cir.1982), *cert. denied,* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983); *Warin,* 530 F.2d at 108.

## D. Acceptance of Responsibility

Finally, Wright challenges the district court's refusal to grant him an offense-level adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, which provides that a

---

"collective" in nature is irrelevant where, as here, the individual's possession of arms is not related to the preservation or efficiency of a militia."). Whichever the case, as a criminal defendant, Wright has "standing" to assert a constitutional challenge to the statute he is charged with violating. *See Morgan v. Commonwealth of Virginia,* 328 U.S. 373, 375, 66 S.Ct. 1050, 1053, 90 L.Ed. 1317 (1946). Accordingly, not a single court has refused to consider a criminal defendant's Second Amendment challenge on "standing" grounds. *Compare Hickman v. Block,* 81 F.3d 98, 101-02 (9th Cir.) (dismissing, due to lack of standing, civil challenge to firearms regulation), *cert. denied,* --- U.S. ----, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996).

Likewise, because Wright has failed to demonstrate any connection to a well regulated militia, we need not consider what showing is required to establish a reasonable relationship between the possession or use of weapons and the preservation or efficiency of such a militia. Finally, we express no opinion as to what governmental interests would be sufficient to justify an infringement on Second Amendment rights in the event such a reasonable relationship is established. *See Warin,* 530 F.2d at 107 ("Even where the Second Amendment is applicable, it does not constitute an absolute barrier to the congressional regulation of firearms.").

[19]We note that § 922(*o*), by its own terms, does not apply with respect to "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(*o*)(2)(A). With this exemption, it appears Congress has avoided any potential conflict with the Second Amendment. See *United States v. Farrell,* 69 F.3d 891, 894 (8th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1283, 134 L.Ed.2d 228 (1996).

"defendant [that] clearly demonstrates acceptance of responsibility for his offense" is entitled to a downward adjustment. *See also United States v. Calhoon,* 97 F.3d 518, 531 (11th Cir.1996) (noting that defendant has burden to prove acceptance of responsibility). Because the acceptance of responsibility determination is generally fact-based and because the district court is in "a unique position" to evaluate the appropriate factual considerations, the ruling of the sentencing judge "is entitled to great deference on review." U.S.S.G. § 3E1.1. comment. (n. 5); *Calhoon,* 97 F.3d at 531 (district court's determination of acceptance of responsibility is reviewed for clear error). Nonetheless, when examining an acceptance of responsibility determination, we review, as always, the district court's application of the Sentencing Guidelines *de novo. See United States v. Purchess,* 107 F.3d 1261, 1265-66 (7th Cir.1997); *United States v. Diaz,* 26 F.3d 1533, 1544 (11th Cir.1994), *cert. denied,* 513 U.S. 1134, 115 S.Ct. 952, 130 L.Ed.2d 895 (1995).

We recently reiterated that the acceptance of responsibility determination is a "multi-faceted concept" that depends on such factors as "the offender's recognition of the wrongdoing of his conduct, his remorse for the harmful consequences of the conduct, and his willingness to turn away from the conduct in the future." *United States v. Calhoon,* 97 F.3d 518, 531 (11th Cir.1996) (quotation and citation omitted); *see also* U.S.S.G. § 3E1.1 comment. (n. 1) (district court should consider, among other factors, whether the defendant has truthfully admitted the conduct comprising the offenses, truthfully admitted or did not falsely deny any relevant conduct, and voluntarily terminated criminal conduct). The fact that a defendant has pleaded guilty and has truthfully admitted the conduct comprising the offense of conviction does not entitle him to a downward adjustment "as a matter of right." U.S.S.G. § 3E1.1 comment. (n. 3); *see also Calhoon,* 97 F.3d at 531. Although a guilty plea, when combined with an admission of criminal conduct, "will constitute significant evidence of acceptance of responsibility," this evidence may be outweighed by "conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 comment. (n. 3).

Despite the multi-faceted nature of the inquiry and the wide latitude afforded sentencing courts under this section, there are limits to what a district court can consider as evidence

inconsistent with acceptance of responsibility. An otherwise deserving defendant cannot be denied a reduction under § 3E1.1 solely because he asserts a challenge to his conviction that is unrelated to factual guilt, such as a constitutional challenge to the statute or a challenge to the applicability of the statute to his conduct. *See Purchess,* 107 F.3d at 1267 (concluding that "district court should not deny the reduction for acceptance of responsibility because the defendant challenges a legal conclusion drawn from the facts the defendant admits"); *United States v. Fells,* 78 F.3d 168, 172 (5th Cir.) (holding that district court erred in denying reduction for defendant who "freely admitted all the facts but challenged their legal interpretation"), *cert. denied,* --- U.S. ----, 117 S.Ct. 134, 136 L.Ed.2d 82 (1996); *United States v. Broussard,* 987 F.2d 215, 224 (5th Cir.1993) (holding that district court erred in denying acceptance of responsibility adjustment when defendant admitted ownership of guns found in home and went to trial only to argue that statute did not apply to uncontested facts), *overruled on other grounds by J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); U.S.S.G. § 3E1.1 comment. (n. 3) (stating that defendant who does not plead guilty may nevertheless clearly demonstrate acceptance of responsibility if he goes to trial in order "to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct").

In this case, Wright immediately admitted upon arrest that he possessed the machineguns, led the agents to the location of these weapons, and consented to the search of his residence that resulted in the discovery of an additional machinegun and the three pipe bombs. After filing a motion to dismiss the indictment on constitutional grounds, Wright timely pled guilty to the offenses charged. Wright thus truthfully admitted the conduct comprising the offenses of conviction—at the time of his arrest, when he pleaded guilty, and at the time of sentencing. He also cooperated with law enforcement authorities and assured the district court that he had not possessed any weapons since his arrest. It is readily apparent from these facts that Wright has presented "significant evidence" of acceptance of responsibility. *See* U.S.S.G. § 3E1.1 comment. (nn. 1 & 3).

The only remaining question is whether the district court relied on permissible considerations in concluding that this evidence was "outweighed by conduct of the defendant that is inconsistent

with such acceptance of responsibility." *See* U.S.S.G. § 3E1.1 comment. (n. 3). After listening to Wright testify at the sentencing hearing, the district court stated:

> This is a hard issue. I think within Mr. Wright's own frame of reference, he is sincere in a lot of the things that he said, but I just do not think Mr. Wright believes that he was a member of a militia whose mission was to protect the citizens of the State of Georgia against threats from the outside. I think Mr. Wright believes that he was a member of a group that was prepared to respond to whatever they perceived to be a threat or a problem. I'm not convinced by his testimony that they believed that they were carrying out the law as opposed to being ready to resist it. So, I will overrule the defendant's objection on the point regarding acceptance of responsibility.

(R3:23). We read these remarks to indicate that the district court denied Wright a downward adjustment because it did not believe that his constitutional challenge was meritorious. The district court apparently (and correctly) understood the Second Amendment to protect only the possession and use of firearms that is reasonably related to an official state militia. The district court further concluded that an official militia must be designed to protect the citizens of Georgia from outside threats and to carry out the law of Georgia, and that Wright had made no showing that he belonged to such a group.

The district court made no findings that the defendant testified untruthfully about his militia involvement. Rather, the district court stated that "I do not see *the evidence* that Mr. Wright's group was really viewing itself as a group that was going to be available to enforce the law and protect the citizens." (R3:24) (emphasis added). At the beginning of the sentencing hearing, before listening to Wright's testimony, the district court stated:

> I think what really bothers me in this case is that Mr. Wright has put forward through counsel an assertion that he believed he was entitled to possess all of these weapons, and apparently the pipe bombs as well because he thought he was a member of a militia, and, therefore, he thought he was constitutionally able to have these things. And that assertion that he is making through counsel to me is not credible, and that's what bothers me.... It appears to me that what has happened is *counsel* has identified some of the publications that seem to be consistent with the idea of defending one's countrymen, and *you* [counsel] have attempted to assert an argument building on his possession of those items.

(R3:5-6) (emphasis added).

Based on this record, we cannot conclude that the district court denied Wright a downward adjustment because of a consideration of permissible factors such as his dishonesty, lack of remorse, or insincerity. Rather, it appears to us that the district court denied the downward adjustment

because it did not believe the *legal* argument defendant's counsel was making based on facts that defendant had truthfully admitted. Because the asserted legal argument did not relate to Wright's factual guilt, we conclude that the district court erred in using it as a basis for denying Wright a downward adjustment for acceptance of responsibility.[20] We therefore remand the case to the district court for a reconsideration of this issue.

### III. Conclusion

Accordingly, we AFFIRM appellant's convictions, VACATE his sentence, and REMAND for resentencing.

COX, Circuit Judge, specially concurring in part and dissenting in part.

I join those parts of the court's opinion that reject Wright's Commerce Clause and Ninth Amendment challenges. I do not join that part of the court's opinion that addresses Wright's Second Amendment challenge, but I concur in the result on the Second Amendment issue.

I dissent from the holding that the district court erred in denying Wright an adjustment for acceptance of responsibility. As the court recognizes, in determining whether a defendant is entitled to an acceptance of responsibility adjustment, a district court may properly consider "the offender's recognition of the wrongfulness of his conduct, his remorse for the harmful consequences of that conduct, and his willingness to turn away from that conduct in the future." *United States v. Scroggins,* 880 F.2d 1204, 1215 (11th Cir.1989). The district court premised its denial of an adjustment on a factual finding that Wright did not recognize that his conduct was wrong and was not sincerely remorseful. The court said:

> I think within Mr. Wright's own frame of reference, he is sincere in a lot of the things that he said, but I just do not think Mr. Wright believes that he was a member of a militia whose mission was to protect the citizens of the state of Georgia against threats from outside. I think Mr. Wright believes that he was a member of a group that was prepared to respond to whatever they perceived to be a threat or a problem. I'm not convinced by his testimony that

---

[20]We recognize that in some instances a legal or constitutional challenge will be so frivolous as to justify a denial of an acceptance of responsibility adjustment. Based on the paucity of Eleventh Circuit case law on the Second Amendment and the substantial body of academic writings supporting Wright's position, *see* Randy E. Barnett and Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 Emory L.J. 1141 (1996)(discussing academic debate), we cannot conclude that Wright's challenge to § 922(*o*) and § 5861(d) presents such a case.

they believed that they were carrying out the law as opposed to being ready to resist it. (R.3 at 23.) An individual's subjective intent or belief is not relevant to the merits of a Second Amendment challenge. Consequently, the district court's comments are properly read as findings that at the time of sentencing Wright did not think that his conduct was wrong and was not remorseful. Since these findings are entitled to great deference, I would affirm the district court's denial of an adjustment for acceptance of responsibility. *See United States v. Hromada,* 49 F.3d 685, 689 (11th Cir.1995) ("A district court occupies the unique position to evaluate whether a defendant has accepted responsibility for his acts; its determination is entitled to great deference on appeal.").

Moreover, even taking as true the court's conclusion that Wright was denied a reduction "because [the district court] did not believe that his constitutional challenge was meritorious," *ante,* at 2530, there was no error. I disagree with the holding that "[a]n otherwise deserving defendant cannot be denied a reduction under § 3E1.1 solely because he asserts a challenge to his conviction that is unrelated to factual guilt, such as a constitutional challenge to the statute...." *Ante,* at 2529. Our case law allows a district court to deny a defendant a reduction under § 3E1.1 based on conduct inconsistent with acceptance of responsibility, even when that conduct includes the assertion of a constitutional right. *See United States v. Henry,* 883 F.2d 1010, 1011 (11th Cir.1989) (holding that denial of § 3E1.1 reduction is not "impermissible punishment" for exercising Fifth or Sixth Amendment rights). *See also United States v. McDonald,* 935 F.2d 1212, 1222 (11th Cir.1991) (rejecting defendant's contention that § 3E1.1 "infringe[s] on his right to appeal because he was unable to express acceptance of responsibility for his deeds at the sentencing hearing while he anticipated bringing this appeal."); *United States v. Jones,* 934 F.2d 1199, 1200 (11th Cir.1991) ("[T]he court's consideration, at sentencing, of the defendants' denial of culpability at trial does not impermissibly punish the defendant for exercising his constitutional right to stand trial.").